WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Jessie Marie Betancourt,

Plaintiff,

v.

Carolyn W. Colvin, Acting Commissioner of Social Security,

Defendant.

No. CV 15-0037-TUC-BPV

**ORDER**

Plaintiff Jessie Marie Betancourt filed the instant action pursuant to 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of Social Security. The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent.  (Doc. 14).  Pending before the Court are Plaintiff's Opening Brief (Doc. 23), Defendant's Brief (Doc. 27), and Plaintiff's Reply Brief (Doc. 28).  For the following reasons, the Court remands this matter for further proceedings consistent with this Order.

I.    **PROCEDURAL HISTORY**

On September 14, 2011, Plaintiff protectively filed applications for disability benefits and supplemental security income under the Social Security Act.  (Doc. 23, p. 2; *see also* Transcript/Administrative Record (Doc. 16) ("Tr.") 23, 208-19).   Plaintiff alleges that she has been unable to work since September 13, 2011 due to back and knee problems; anxiety; bipolar disorder; depression; post-traumatic stress disorder ("PTSD"); and rheumatoid arthritis. (Tr. 240). After Plaintiff's applications were denied initially and upon reconsideration, she requested a hearing before an Administrative Law Judge ("ALJ").  (Doc. 23, p. 2).  On May 21, 2013, the matter came on for hearing before ALJ

Geroge W. Reyes, where Plaintiff, who was represented by counsel, and Vocational Expert ("VE") Kathleen McAlpine testified.  (Tr. 55-91).  On July 26, 2013, the ALJ issued an unfavorable decision.  (Tr. 23-36). The Appeals Council subsequently denied Plaintiff's request for review, thereby rendering the ALJ's July 26, 2013 decision the final decision of the Commissioner.  (Tr. 1-6). Plaintiff then initiated the instant action.

## II.   PLAINTIFF'S BACKGROUND AND STATEMENTS IN THE RECORD

Plaintiff was born in December 1965.  (Tr. 208).  She went to school through the eighth grade.  (Tr. 59).  From 2000 through 2011, she worked as a home health aide.  (Tr. 58-59, 248).

When Plaintiff was seven or eight years of age, she was involved in an car accident where she was ejected from a car.  (Tr. 322, 604).  She has had increasing discomfort since that time.  (Tr. 604).  From about the age of eight, Plaintiff grew up in foster care, where she was molested by her foster father when she was ten years of age.  (Tr. 322).  She was raped by a friend when she was fourteen years of age.  (*Id.*).  Plaintiff's husband of 20 years verbally and physically abused her.  (Tr. 322, 802).

Plaintiff testified that in the past, she used a cane on bad days, and presently she uses it all the time.  (Tr. 79; *see also* Tr. 574 (in 2012 Plaintiff's treating doctor ordered a cane for knee pain)).  Walking, and standing and sitting too long, exacerbate her low back pain.  (Tr. 84).   With regard to rheumatoid arthritis, Plaintiff's hands become achy and stiff and she can use them for about 20 minutes at a time before needing to rest.  (Tr. 81-83).  Emotionally, Plaintiff struggles to sleep at night and she suffers from panic attacks.  (Tr. 85; *see also* (Tr. 256 "I toss turn all night because pain can't get comfortable position.  Worry a lot what kind future.  No hope.  Suicidal.  Helpless…."); Tr. 563 (Plaintiff "complains of anxiety that manifests as she is falling asleep; it feels terrifying, and she awakens fully…."))  The record reflects Plaintiff's report that she does not trust anyone.  (Tr. 563).

Plaintiff's medications include oxycodone, sulfasalazine, cyclobenzaprine, metoprolol tartrate, and paroxetine.  (Tr. 292).

**III.   THE ALJ'S DECISION**

    **A.   CLAIM EVALUATION**

    Whether a claimant is disabled is determined pursuant to a five-step sequential process.  See 20 C.F.R. §§404.1520, 416.920.  To establish disability, the claimant must show that: (1) she has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) she has a severe impairment(s) ("Step Two"); and (3) her impairment(s) meets or equals the listed impairment(s) ("Step Three").  "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)[1]….After developing the RFC, the ALJ must determine whether the claimant can perform past relevant work…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Dominguez,* 808 F.3d at 405.

    **B.   The ALJ's Findings in Pertinent Part**

    The ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease; status post hernia repair; gastrointestinal esophageal reflux disease ("GERD"); right knee internal derangement; affective disorder; and anxiety disorder. (Tr. 25).  He found that Plaintiff's impairments did not meet a listing.  (Tr. 26). He found that Plaintiff had the RFC to:

> Occasionally lift up to 10 pounds, frequently less than 10 pounds; stand and walk 2 out of every 8 hours; sit 6 out of every 8 hours; she has no real limitations against pushing and pulling except such limits in accordance with lifting and carrying limitations; she uses a cane to ambulate; she cannot use ladders, ropes and scaffolds; cannot kneel or crouch; can occasionally use ramps or stairs or stools and occasionally balance, stoop or crawl; can attend and concentrate in two hour blocks of time throughout an

---

[1] "The RFC is defined as 'the most' the claimant can do, despite any limitations." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

8-hour workday with the two customary breaks during the workday and the customary lunch period; should avoid concentrated exposure to extreme cold, vibrations or hazards, hazards being commonly defined as either unprotected heights or dangerous machinery.  She is limited to simple, routine tasks and cannot perform such tasks in a fast-paced production environment (examples of which are a McDonald's restaurant at noontime or the pace reflected in the famous "I Love Lucy" episodes with the chocolates on the conveyor belt whizzing by Ethel and Lucy); she is limited to only occasional interaction with supervisors, co-workers and the general public.

(Tr. 28).

Based upon the VE testimony, the ALJ found that Plaintiff was unable to perform her past relevant work as a home health aide.  (Tr. 33-34).  Based upon the VE testimony, the ALJ determined that Plaintiff could perform work such as an assembly production worker and electronic assembler, which exist in significant numbers in the national economy.  (Tr. 34-35).   Therefore, the ALJ determined that Plaintiff was not disabled under the Social Security Act from September 13, 2011 through the date of his decision. (Tr. 36).

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred by (1) improperly rejecting the opinion from Plaintiff's treating doctor; (2) improperly discounting Plaintiff's symptom testimony; and (3) failing to articulate a basis for Plaintiff's work capacities based on substantial evidence in the record as a whole. Defendant counters that the ALJ's decision was free of error on all matters at issue.

### A.   STANDARD

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).   The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the Court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

## B.  THE ALJ'S REJECTION OF THE TREATING DOCTOR'S OPINION

Plaintiff challenges the ALJ's decision not to give controlling weight to the opinion from her treating doctor, Adalberto Renteria, M.D.

### 1.  OPINIONS AT ISSUE

#### a.  TREATING DR. RENTERIA

On April 24, 2013, Dr. Renteria completed a Medical Assessment of Ability to Do Work Related Physical Activities wherein he indicated that Plaintiff's diagnoses of disc herniation at L5-S1, degenerative disease of right knee, and fibromyalgia/polyarthralgia. (Tr. 752). He indicated that Plaintiff could occasionally lift and carry less than 10 pounds and that he did not "think that she can…frequently…" carry any weight. (*Id.*). She could

stand at most three to four hours in an eight-hour workday and she could sit, at most, for that same amount of time, and in both instances she would need to frequently change position. (*Id.*). Plaintiff would need to alternate between sitting and standing every one to two hours and she would require a cane. (Tr. 752-53). She should never climb and should avoid balancing, stooping, kneeling, crouching, and crawling. (Tr. 753). She was limited to frequent use of her right and left hands, and she could only occasionally reach overhead. (Tr. 753-54). She should avoid heights, moving machinery and temperature extremes. (Tr. 754). Dr. Renteria stated that Plaintiff "suffers from chronic low back pain and myalgias [and] arthralgias. She also has significant behavioral health diagnosis that contribute to her extreme experience of pain." (*Id.*).

Also in April 2013, Dr. Renteria completed a Pain Functional Capacity Questionnaire where he indicated, among other things, that Plaintiff experienced pain sufficiently severe to frequently cause deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner in a work setting or otherwise. (Tr. 750-51).

### b.    EXAMINING DR. ROTHBAUM

On March 5, 2012, Jerome Rothbaum, M.D., completed a consultative examination of Plaintiff. (Tr. 584-90). Dr. Rothbaum found no tenderness upon examination of Plaintiff's back or knees. (Tr. 586). McMurray's test was mildly positive on the right. (*Id.*). Plaintiff walked with a slight antalgic gait, slightly limping on the right knee. (Tr. 587). She used a cane. (*Id.*). She was able to get up and down from the examining table normally. (*Id.*). Dr. Rothbaum diagnosed low back pain, which appeared to be primarily myofascial in origin; hypertension; right knee pain, which probably involved internal derangement; history of rheumatoid arthritis, not substantiated; abdominal pain, not substantiated; and anxiety/depression. (*Id.*). He concluded that Plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. (Tr. 588). She could stand at least two hours, but less than six hours, in an eight hour workday and she was unlimited in sitting. (*Id.* ("She

ought to be able to stand and walk a total of 5 to 6 hours per day, one hour at a time with five-minute break due to internal derangement of right knee.")).  Plaintiff should never climb ladders, ropes or scaffolds, and could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.  (Tr. 589).  She had no limitations with regard to reaching, handling, fingering or feeling.  (*Id.*).  Plaintiff was restricted from working around heights and moving machinery.  (*Id.*).

### c.   NONEXAMINING DR. COMBS

On August 28, 2012, Charles Combs, M.D., who did not examine Plaintiff, completed an RFC assessment wherein he indicated that Plaintiff could:  occasionally lift and carry up to 10 pounds and frequently lift and carry less than 10 pounds; stand a total of two hours and sit for about six hours in an eight-hour day.  (Tr. 123).  She should never climb ladders, ropes and scaffolds and never kneel or crouch.  (*Id.*).  She could occasionally climb ramps and stairs, stoop and crawl.  (*Id.*).  Dr. Combs determined that Plaintiff had no manipulative limitations.  (Tr. 124).  He opined that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards.  (*Id.*).  To support his findings, Dr. Combs cited Plaintiff's chronic low back pain with MRI confirming degenerative disc disease with two protrusions, facet osteoarthritis at several levels, right knee internal derangement in the form of a meniscal tear, tender knee with positive McMurray sign, Plaintiff's use of a cane and antalgic gait, and her weight of 196 pounds at five feet four inches tall.  (Tr. 123, 125).

### d.   NONEXAMINING DR. GARLAND

On August 28, 2012, Randall Garland, Ph. D., opined that Plaintiff was moderately limited in the abilities to:  understand and remember detailed instructions; maintain attention and concentrate for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without a unreasonable number and length of rest periods; interact with the general public; accept instructions and respond

appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a work setting.  (Tr. 125-26).  He ultimately determined that Plaintiff

> [Plaintiff] should be able to meet the basic mental demands of competitive, remunerative, unskilled work on a sustained basis particularly in settings of low social contact, including the abilities to understand, carry out, and remember simple instructions; make judgments commensurate with the functions of unskilled work, i.e., simple work-related decisions; respond appropriately to supervision, coworkers and work situations [and] deal with changes in a routine work setting.

(Tr. 127).

## 2.   ANALYSIS

It is well-settled that the opinions of treating doctors are entitled to greater weight than the opinions of examining or nonexamining physicians.  *Andrews v. Shalala,* 53 F.3d 1035, 1040-1041 (9th Cir. 1995). Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  Medical opinions and conclusions of treating doctors are accorded special weight because treating doctors are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to substantial weight.") (internal quotation marks and citation omitted); 20 C.F.R 20 § 404.1527(c)(2) (generally, more weight is given to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations …."); 20 C.F.R. §404.927 (same).

A treating physician's opinion may not be entitled to controlling weight where it is

not "well-supported" or inconsistent with other substantial evidence in the record. *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)).  In such a case, the ALJ must consider the factors outlined in the regulations for determining what weight to accord the opinion of the treating physician.[2]  *Id* at 631-32.; *see also* Social Security Ruling 96-2p, 1996 WL 374188, *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").   Thus, even if the treating physician's opinion does not meet the test for controlling weight, his opinion may still be entitled to the greatest weight and should be adopted.  *See Orn,* 495 F.3d at 633.

An ALJ may reject a treating doctor's uncontradicted opinion only after giving "'clear and convincing' reasons supported by substantial evidence in the record." *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)).  "Even if the treating doctor's opinion is contradicted by another doctor,

---

[2] The factors for consideration as to the weight the opinion will be given include

the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. [20 C.F.R.] § 404.1527(d)(2)(i)-(ii)….Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id.* § 404.1527(d)(3)-(6).

*Orn*, 495 F.3d at 631.

the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick,* 157 F.3d at 725 (citing *Lester,* 81 F.3d. at 830). Additionally, "like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31 (this standard also applies when the ALJ rejects opinions from the examining doctor in favor of the nonexamining doctor).

The ALJ acknowledged that Dr. Renteria's assessed limitations would preclude sedentary work. (Tr. 32). The ALJ declined to give controlling weight to Dr. Renteria's opinion, stating:

> The rheumatology and neurological specialists to whom Dr. Renteria referred the claimant have not restricted the claimant's functioning. Their clinical and diagnostic findings do not support disabling limitations. For example, neurologist Thomas Norton reported that he was unable to correlate the claimant's signs and symptoms with the pathology of her lumbar MRI. MRI of the cervical spine showed only mild degenerative disc disease. Imaging was described as being unremarkable for any significant radiculopathy or central canal stenosis. The claimant had normal strength on formal testing in May 2012 and her gait was normal….In March 2013, Dr. Berchman Vaz noted that the claimant had full range of motion of all joints of her hands, and her neurological exam was nonfocal….

(*Id.*).

The ALJ gave substantial weight to examining Dr. Rothbaum's and nonexamining Dr. Comb's opinions that Plaintiff could perform sedentary work (Tr. 29-30, 33; *see also* Tr. 33 (the ALJ also gave substantial weight to nonexamining Dr. Garland's opinion regarding Plaintiff's mental impairments)). The ALJs RFC assessment, with regard to Plaintiff's exertional limitations, essentially tracks nonexamining Dr. Combs' limitations, which were more restrictive than Dr. Rothbaum's assessment. The ALJ also included in his RFC assessment that Plaintiff walked with a cane.

Defendant contends that the ALJ properly declined to give controlling weight to Dr. Renteria's opinion because the ALJ found Dr. Renteria's opinion was inconsistent

with the findings of Dr. Norton, a neurologist, and Dr. Vaz, a rheumatologist. (Doc. 27, pp. 15-16; *see also* Tr. 32).   Defendant also asserts that Dr. Renteria's opinion was contradicted by the opinions from nonexamining state agency Drs. Comb and Garland.[3] (Doc. 27, p. 14 & n.4).   Accordingly, Defendant contends that the ALJ needed to only state specific and legitimate reasons to reject Dr. Renteria's opinion.   (*Id.* at p. 14). Plaintiff correctly points out that the opinion of a nonexamining physicians like Drs. Combs and Garland cannot by themselves "constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831.   However, the record reflects that Dr. Renteria's opinion was contradicted by examining Dr. Rothbaum who, like the nonexamining doctors, determined that Plaintiff could perform sedentary work.   In this case, even if analysis of the factors set out in the regulations support the conclusion that Dr. Renteria's opinion was entitled to some weight, the ALJ may still reject that opinion by stating specific and legitimate reasons for doing so.  *See Orn,* 495 F.3d at 634-35.  "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'" *Tommasetti* 533 F.3d at 1041 (quoting *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989)).

The ALJ first stated "[t]he rheumatology and neurological specialists to whom Dr. Renteria referred the claimant have not restricted the claimant's functioning."  (Tr. 32). Defendant has not specifically defended the ALJ's rejection of Dr. Renteria's opinion based on this reason. (*See* Doc. 27). "The primary function of medical records is to promote communication and record-keeping for health care personnel—not to provide evidence for disability determinations." *Orn,* 495 F.3d at 634.  Dr. Renteria did not refer Plaintiff to these specialists for a functional assessment, he did so for diagnostic and treatment purposes.  "A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination

---

[3] The remainder of Defendant's argument addressing the ALJ's rejection of treating Dr. Renteria's opinion does not discuss the ALJ reliance on Dr. Garland's findings.  (*See* Doc. 27, pp. 13-18).

when that doctor was not asked to express an opinion on the matter and did not do so, particularly where the doctor did not discharge the claimant from treatment." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001). In the context of this record, the lack of functional restrictions assessed by the specialists does not constitute a specific and legitimate reason to reject Dr. Renteria's opinion.

The ALJ also cited findings by neurologist Thomas Norton and rheumatologist Berchman Vaz to support rejection of Dr. Renteria's opinion. On April 23, 2012, Dr. Norton examined Plaintiff upon referral from Dr. Renteria for "complaint of pain in her neck, back, arms and legs with stiffness." (Tr. 604). On physical examination, Plaintiff exhibited diffuse tenderness to palpation over the back and neck area. (*Id.*). She had good motor strength. (*Id.*). Knee reflexes were 1+ and ankle reflexes were trace. (*Id.*). Dr. Norton indicated that Plaintiff's MRI showed "a slight disc protrusion at L5-S1, which was central, with a mild degree of canal stenosis. At L4-L5, there was mild facet arthropathy and there was a degenerated disc at L3-L4."[4] (*Id.*; *see also* Tr. 603 (the MRI of Plaintiff's cervical spine was normal)). Dr. Norton could not correlate Plaintiff's signs and symptoms with the pathology seen on the lumbar MRI. (Tr. 605). In May 2012, Dr. Norton's partner, Dr. Badruddoja, after noting that Plaintiff's imaging was "unremarkable for any significant radiculopathy or central canal stenosis", recommended physical therapy and pain management. (Tr. 603). In summarizing Dr. Norton's findings, the ALJ stressed Dr. Norton's inability to correlate Plaintiff's symptoms to the results of the lumbar MRI and Dr. Norton's findings that Plaintiff had normal strength on formal testing. (Tr. 32). The ALJ also cited Dr. Badruddoja's May 2012 finding that Plaintiff's gait was normal. (*Id.*).

Additionally, the ALJ cited rheumatologist Dr. Vaz's findings that Plaintiff "had

---

[4] A February 2012 MRI reflected disc desiccation at all levels from L2 through S1. (Tr. 569). Degenerative changes and facet arthropathy were present at L4 through L5. (*Id.*). At L2-L3, L3-L4, and L4-L5, disc protrusions resulted in mild effacement of the thecal sac without neural abutment, and at L5-S1, disc protrusion resulted in mild abutment of the S1 nerve roots bilaterally with a mild degree of central canal stenosis. (*Id.*).

- 12 -

full range of motion of all joints of her hands, and her neurological exam was nonfocal."
(*Id.*).   Plaintiff first saw Dr.  Vaz in August 2012 upon referral from Dr. Renteria for
complaints of diffuse muscle and joint pain in her hands and feet.  (Tr. 730).  She stated
she had difficulty gripping and holding things.  (*Id.*).  She also reported low back pain.
(*Id.*).  On examination, Plaintiff had normal range of motion in her cervical spine, wrists,
elbows, knees, and minimal decreased range of motion in her hips.  (Tr. 730-31).  She
had bilateral subacromial bursitis in the shoulders, lateral epicondylar pain bilaterally,
tenderness at the MCPs bilaterally, peri lumbar tenderness, bilateral greater trochanteric
bursitis, tenderness in the knees, tenderness in both ankles with the right being fuller than
the left, and metatarsal head tenderness in the feet.  (*Id.*).  There was no evidence of
synovitis.  (*Id.*).  Plaintiff's gait was normal.  (Tr. 731).  Plaintiff was positive for all 18
tender points indicative of fibromyalgia.  (*Id.*).  Dr. Vaz's diagnoses included
polyarthralgia and myalgia.  (*Id.*).  He stated:

> Clinically, the patient does not have active synovitis to suggest an
> inflammatory process at this time.  However, agree with concerns regarding
> her slightly elevated rheumatoid factor.  We will check further lab work as
> well as ultrasound her hands/wrists to evaluate any synovitis and also x-
> rays to see if there are any erosive changes….Some of her diffuse pain may
> also be related to fibromyalgia as she has all the tender points on exam
> today; will defer therapeutic options to PCP.

(Tr. 731-32).

In September 2012, Dr. Vaz reported that x-rays of Plaintiff's hands, wrists and
feet showed no erosive changes.  (Tr. 725).  He also stated that Plaintiff's "RF came back
positive and she likely has seropositive rheumatoid arthritis", for which he prescribed
Plaquenil Sulfate.  (Tr. 727).

Defendant argues that the ALJ's reliance on the Drs. Norton's, Badruddoja's and
Vaz's findings undercuts Dr. Renteria's restrictions.  For example, Defendant points out
that although Dr. Renteria assessed Plaintiff as having the complete inability to
frequently lift objects and only being able to lift up to ten pounds occasionally, Dr.
Badruddoja reported normal motor strength, as did Dr. Norton.  Defendant also stresses
that the neurologists indicated Plaintiff's gait was normal, which Defendant contends

contradicts Dr. Renteria's finding that Plaintiff could never balance, stoop, kneel, crouch, or crawl.   Defendant also challenges Dr. Renteria's assessed limitations regarding Plaintiff's use of her hands in light of  Dr. Vaz's findings that Plaintiff had a good grip, full range of motion in all the joints of her hands as well as unremarkable neurological findings.   Defendant also points out that Dr. Vaz reported Plaintiff had normal motor strength, normal gait and no evidence of inflammatory process.

Plaintiff points out that the record reflects instances where Dr. Renteria found gait disturbance. (Doc. 23, p. 23 n.25 (citing Tr. 578 (February 2012); Tr. 699 (November 2012); Tr. 693, 689 (January 2013); Tr. 679 (February 2013); Tr. 674 (March 2013); Tr. 668 (April 2013); *see also* Tr. 706 (August 2012)).   In February 2012, Dr. Renteria ordered a cane for knee pain.  (Tr. 574).   Additionally, examining Dr. Rothbaum also noted Plaintiff "walks with a slight antalgic gait, slightly limping on the right knee."  (Tr. 587).  Plaintiff also points out that although Dr. Vaz stated she had full range of motion in all joints of her hands, the ALJ omitted Dr. Vaz's finding on examination that Plaintiff had mild swelling of the finger joints (PIPs and MCPs).  (Doc. 23, p. 23 (citing Tr. 718)). Dr. Vaz did find "some tenderness at most of the MCPs and trace swelling at the right 2[nd] and 3rd MCPs."  (Tr. 718). Further, the ALJ's discussion of Dr. Vaz's report, in that portion of the decision specifically relying on same to reject Dr. Renteria's opinion, did not mention that Dr. Vaz found Plaintiff was positive for fibromyalgia tender points.

Plaintiff persuasively argues that Defendant's recitation of the ALJ's reasoning with regard to the specialists' findings "fails to explain how these findings detract from the legitimacy of Dr. Renteria's assessments, or consider these findings in the broader context of Betancourt's seropositive rheumatoid arthritis, ployarthralgia, and fibromyalgia."  (Doc. 28, p.5).   Although, at one point in his decision, the ALJ recognized that Dr. Vaz found "[a]ll 18 fibromyalgia tender points were positive" and that Dr. Vaz's assessment included "likely seropositive rheumatoid arthritis" (Tr. 30), the ALJ did not include fibromyalgia[5] or rheumatoid arthritis in his determination of

---

[5] Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous

Plaintiff's severe impairments.[6]  Nor did he include polyarthralgia[7], which Drs. Vaz and Renteria also diagnosed, among Plaintiff's severe impairments.  It is well-settled that:

> The ALJ is required to consider all of the limitations imposed by the claimant's impairments, even those that are not severe. Social Security Ruling ("SSR") 96–8p (1996). Even though a non-severe "impairment[ ] standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." *Id.*

*Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1164 (9th Cir. 2008); *see also Smolen v. Chater,* 80 F.3d 1273, 1290 (1996) ("[T]he ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each one alone was sufficiently severe.").  Plaintiff points out that patients with fibromyalgia "'on physical examination will usually yield normal results—a full range of motion, no joint swelling, as well as normal motor strength and neurological reactions.'" (Doc. 23, p. 24 (quoting *Preston v. Sec. of Health & Human Servs.,* 854 F.2d 815, 817-18 (6th Cir. 1988)); *see also Sarchet,* 78 F.3d at 307 ("Since swelling of the joints is not a

---

connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (citations omitted).  Common symptoms of fibromyalgia, many of which Plaintiff complains of here, include chronic diffuse pain throughout the body; multiple tender points; sensitivity to stress and activity level; chronic fatigue; sleep disturbance; stiffness; and depression.  *Id.* at 589-590; *Willis v. Callahan*, 979 F.Supp. 1299, 1303 n. 2 (D. Or. 1997). "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community." *Benecke,* 379 F.3d at 590.  *See also Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996) (fibromyalgia is "a common, but elusive and mysterious disease...").  "'There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and the only symptom that discriminates between it and other diseases of a rheumatic character multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Rollins v. Massanari,* 261 F.3d 853, 855 (9th Cir. 2001) (quoting *Sarchet,* 78 F.3d at 306) (internal quotation marks omitted); *see also* SSR 12-2p, 2012 WL 3104869.  The Ninth Circuit has observed that fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Benecke*, 379 F.3d at 590.

[6] "'An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart,* 433 F. 3d 683, 686 (9th Cir. 2005) (quoting *Smolen,* 80 F.3d at 1290).

[7] Polyarthralgia involves pain in two or more joints.  *See* http://c.merriam-webster.com/medlineplus/polyarthralgia (last visited March 28, 2016).

symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a persons' prostate cancer is not advanced.").

The Commissioner's regulations recognize that treating physicians like Dr. Renteria "bring a 'unique perspective to the medical evidence.' 20 C.F.R. § 404.1527(d)(2). An integral part of the treating physician's role is to take into account all the available information regarding all of his patient's impairments—including the findings and opinions of other experts. The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment." *Lester*, 81 F.3d at 833.  Dr. Renteria's referral to specialists presumably enabled him to rule out some diagnoses or options for treatment and to rule in others, such as fibromyalgia.  Importantly, the doctors whose opinions the ALJ accorded substantial weight did not address Dr. Vaz's finding that Plaintiff was positive for fibromyalgia.

On this record, the ALJ failed to state sufficient reasons for rejecting Dr. Renteria's opinions.

## C.   PLAINTIFF'S CREDIBILITY

Plaintiff takes issue with the ALJ's finding that although her impairments could reasonably be expected to cause the symptoms she complained of, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (Tr. 28).

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  *Orn*, 495 F.3d at 635 (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptom(s), and there is no affirmative

finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing, which "'is the most demanding [standard] required in Social Security cases.'" *Garrison v. Colvin,* 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)); *see also Burrell v. Colvin,* 775 F.3d 1133, 1137 (9th Cir. 2014) (reaffirming that the "clear and convincing" standard applies in such cases). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284; *see also Orn,* 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive).  In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms or between testimony and conduct, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and functional restrictions caused by the symptoms.  *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Orn,* 495 F.3d 636; *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 884 (9th Cir 2006); *Smolen*, 80 F.3d at 1284.

After stating that he did not find Plaintiff completely credible, the ALJ turned his discussion to the medical evidence of record.  However, the ALJ cannot rely lack of objective medical evidence, alone, to discount a claimant's testimony. *See Robbins,*  466 F.3d at 883.  In this case, there is no dispute that the record establishes the existence of impairment to Plaintiff's spine and right knee, that she has mental impairments, tested positive for rheumatoid factor, and also has exhibited tender points consistent with fibromyalgia.  The ALJ's discussion of the medical evidence did not account for the totality of Plaintiff's impairments.

The ALJ's cited reasons to discount Plaintiff's credibility included her: refusal to

have knee surgery and instead to take pain medication; discontinuation of physical therapy after two cancellations and two absences in one month of treatment; and discontinuation of arthritis medication on her own "despite allegations of disabling pain." (Tr. 29-30).

Plaintiff does not address the ALJ's finding that she declined right knee surgery for a meniscal tear. (*See e.g.* Tr. 460 (recommending surgery); Tr. 502 ("Was seen by ortho for knee pain who suggest surgery, but she does not want."); Tr. 722 ("She also has chronic knee pain from previous injuries. She has refused surgery in the past.")). Plaintiff does not deny that she discontinued physical therapy. (*See* Doc. 23, p. 27). Instead, she points out that "the ALJ did not say why[]" she stopped physical therapy. (*Id.*). One of the physical therapy records reflects Plaintiff's statement that "'I don't think I can take more than 1x/week because of my multiple other problems of knee, neck, ankle and hernia pain.'"[8] (Tr. 647). When Plaintiff called to discontinue physical therapy she stated she did not feel it was helping, that she thought one of the exercises caused her right knee to hurt and that she was concerned about "'a hernia that needs [second] repair' and she is scared she is going to do 'more damage to it, her back, and [both] knees." (Tr. 645 (September 2011)). As to arthritis medication, the record reflects that Plaintiff stopped taking Plaquenil after two weeks because she did not think it was helping. (Tr. 80). She testified that she also stopped taking methotrexate, which was prescribed in place of Plaquenil, because "I got a side effect of watery burning eye sensation." (Tr. 80; *see also* Tr. 719, 722 (noting Plaintiff "is skeptical about taking medications.")). Here, Plaintiff argues that the ALJ ignored her report of this side effect. (Doc. 23, p. 27). In place of methotrexate, Dr. Vaz prescribed sulfasalazine, which Plaintiff is apparently still taking. (Tr. 292, 719).

"[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for

---

[8] Plaintiff has undergone more than one surgery for hernia repair. (*See* Tr. 477, 490).

finding the complaint unjustified or exaggerated." *Orn*, 495 F.3d at 638.  However, while Social Security regulations require claimants to follow treatment prescribed by a doctor to receive benefits, the same regulations make clear that if the claimant has "a good reason" for not following the prescribed treatment, rejection of treatment will not be held against the claimant. *See* 20 C.F.R. §§ 416.930(a) & (b), 404.1530(a) & (b); SSR 82-59, 1982 WL 31384; SSR 96-7p, 1996 WL 374186. The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay...." *Orn*, 495 F.3d at 638 (quoting SSR 96–7p at 7–8)). *See also Smolen*, 80 F.3d at 1284 ("Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so.").  In addition to her physical impairments, Plaintiff has been diagnosed with bipolar disorder II, PTSD, generalized anxiety disorder, somatoform disorder (fear of cancer), and the ALJ found that Plaintiff's severe impairments included affective disorder and anxiety disorder.  (Tr. 25, 26).  "Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized that psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'"  *Pate-Fires v. Astrue,* 564 F.3d 935, 945-46 (8th Cir. 2009) (quoting *Zeitz v. Sec'y of Health and Human Servs.,* 726 F.Supp. 343, 349 (D. Mass 1989)).  Here, Plaintiff has not offered any argument that her non-compliance was attributable to her mental impairments rather than her own personal preference.  *See Molina v. Astrue,* 674 F.3d 1104, 1114 (9th Cir. 2012) .  She has not proffered any reason to this Court to explain why she declined knee surgery and discontinued physical therapy had the ALJ so inquired.  Even if she had, it is not within the Court's province to determine the credibility of that information.  What the record does show is that when asked about a specific instance of apparent non-compliance,

Plaintiff responded that she suffered side effects, which the ALJ held against her without any further discussion.  (*See* Tr. 30).

While Plaintiff's apparent failure to follow prescribed treatment can weigh against her, the record does not clearly establish the theory that she did so out of preference rather than for a "good reason" given that the ALJ did not inquire about every instance he used to support his credibility finding and he failed to specifically assess the reason she provided when he asked about discontinuation of the arthritis medication. Moreover, the record reflects that Plaintiff has continued on medication for rheumatoid arthritis that was prescribed in place of methotrexate, which supports the conclusion that Plaintiff did not abandon all attempts to treat her rheumatoid arthritis through medication.

Defendant argues that "[t]he ALJ properly found Plaintiff not credible because the evidence indicated she 'had a back condition but continued to be able to work as a care giver requiring lifting and carrying.'"  (Doc. 27, p. 11 (quoting Tr. 29)).  In the same paragraph that contains this statement, the ALJ stated that Plaintiff's "back pain was reported to have begun over 20 years ago[]" and that "[t]he claimant reported worsening pain in October 2011."  (Tr. 29).  Generally, "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003).  Further, Plaintiff alleges a disability onset of September 13, 2011 which is consistent with complaints of worsening back pain near that time. Moreover, she alleges other impairments in addition to back pain.  The ALJ, in essence, ultimately agreed that Plaintiff could no longer perform her past work given his finding that she could not return to her past relevant work.  In the context of this record, the fact that Plaintiff worked in the past is not a clear and convincing reason to find her unbelievable.

Neither party specifically addresses the ALJ's statement, elsewhere in his opinion that Plaintiff "sought disability status to obtain housing or a housing allowance….Apparently the claimant's prior physician, Hella Nordberg, indicated that

the claimant should take off work for a year due to medical and mental health needs, but Dr. Nordberg did not clearly state the claimant was disabled.  [In October 2011, new provider] Dr. Maric did not see the claimant as disabled….These notes call into question the claimant's allegations of disability due to back and knee problems, rheumatoid arthritis, anxiety, PTSD, depression and bipolar disorder." (Tr. 33).  The ALJ does not discuss the doctors' reports in further detail.  Regardless whether Dr. Nordberg "clearly" found Plaintiff to be disabled, Dr. Nordberg's recommendation that Plaintiff not work for a year arguably supports Plaintiff's allegations that her impairments interfered with her ability to work.  Dr. Maric apparently saw it differently. By the time of the ALJ's decision, Dr. Vaz had opined that Plaintiff suffered from likely seropositive rheumatoid arthritis and fibromyalgia and Dr. Renteria had issued his opinion that Plaintiff was essentially restricted to less than sedentary work.  Upon consideration of the record as a whole, the ALJ's discussion of the opinions from Drs. Nordberg and Maric do little to undermine Plaintiff's credibility.

The ALJ also discounted Plaintiff's credibility based on his finding that she made inconsistent statements about alcohol use. (Tr. 31-32).  Plaintiff admitted to alcohol abuse in the past.  (Tr. 77).   When the ALJ asked about this, she testified that she had been drinking "maybe four to six beers a day maybe three times a week" for about "five years off and on."  (Tr. 77-78).  Plaintiff testified she did not remember when she stopped drinking, however, she recalled that she "started the meds like two years ago and I wasn't drinking."  (Tr. 78).  She testified that she stopped drinking "on my own and the psychiatrist [Dr. Meglathery] helped me by the counsel she gave me, it helped."  (*Id.*).  Plaintiff's testimony also reflected that she had seen Dr. Meglathery in 2007.  (Tr. 79).  The ALJ went on to ask:  "And during the six months that you saw her, she's the one that helped you quit drinking.  Is that correct?"  (Tr. 79).  Plaintiff responded: "Yes."  (*Id.*).  The ALJ revisited the issue of alcohol later in the hearing to ask:  "So…for the five years before you met [Dr. Meglathery]…, is that when you would have been abusing alcohol?"  (Tr. 86) Plaintiff responded:  "Yes, Judge."  (*Id.*).  When the ALJ asked Plaintiff whether

she had abused alcohol at any other time in the past, Plaintiff responded that she had when she was about 12 years of age until she became pregnant with her first child around the age of 16.  (Tr. 86-87).  She testified that she stopped drinking on her own because she was pregnant.  (Tr. 87).

The ALJ found that "[g]iven her ongoing substance abuse, her claim that she stopped drinking [when she was pregnant] without assistance seems unlikely."  (Tr. 31).  He found suspect that Plaintiff could not remember the date she stopped drinking.  (Tr. 32).  The ALJ cited a 2007 report from Dr. Meglathery that Plaintiff stated she stopped drinking two years before seeing Dr. Meglathery, which the ALJ found conflicted with Plaintiff's testimony that Dr. Megalthery "helped her stop drinking."  (Tr. 32 (citing Tr. 810)).  The ALJ also cited examining psychologist Dr. Rohen's report that Plaintiff reported in 2012 that she did not use alcohol and that "[s]he drank heavily after she gave up custody of her children to her ex, but her psychiatrist at the time told her she'd end up in an institution if she didn't quit.  She has not drunk heavily since 2002."  (Tr. 563; *see also* Tr. 32).  The ALJ went on to state:  "Recovering alcoholics always know the exact date they stopped drinking, so the claimant's failure to identify that date affects her credibility.  The undersigned finds that in light of the claimant's suspicious failure to recall when she stopped drinking, her statement explaining how much she drank daily and weekly is internally inconsistent."  (Tr. 32).

Defendant argues that the ALJ may infer that Plaintiff's lack of candor about her alcohol use carries over to her description of her physical pain.  (Doc. 27, p. 11 (citing *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002) (discounting the plaintiff's credibility upon consideration of the plaintiff's conflicting information about drug and alcohol use, in addition to other factors such as little propensity to work prior to disability onset and daily activities)).  The ALJ bases much of his credibility determination on the date Plaintiff quit drinking.  Plaintiff testified that she did not remember the date, but that she did stop drinking.  (Tr. 77).  The ALJ erroneously rejected this assertion based on his belief that all alcoholics who have stopped drinking "always" remember the date. There

is no support in the evidence for the ALJ's assumption.  Nor is there support for the ALJ's assumption that Plaintiff could not have stopped drinking on her own.  Moreover, Plaintiff argues that the ALJ mischaracterized her testimony about Dr. Meglathery.  (Doc. 23, p. 28).  She "did not testify that she stopped drinking when…[Dr. Meglathry] helped her [as stated by the ALJ]; she testified 'I actually stopped drinking on my own and the psychiatrist helped me by the counsel she gave me, it helped.'"  (*Id.* (quoting Tr. 78)).  What is left then is the discrepancy in dates in Dr. Meglathery's and Dr. Rohen's notes.  On the instant record, that discrepancy, alone, cannot serve to undermine Plaintiff's symptom testimony.  *See e.g. Robbins,* 466 F.3d at 884 & n.2 (declining to accept ALJ's negative credibility finding based on one potential conflict in plaintiff's self-reporting of his alcohol use).

At bottom, the ALJ's credibility finding is not supported by clear and convincing evidence.

### D.   THE ALJ'S RFC DETERMINATION

Plaintiff argues that the ALJ stated no basis supported by substantial evidence, for his RFC determination, which essentially mirrored the nonexamining state reviewers' recommendations. (Doc. 23, pp. 28-32).   Plaintiff argues that the nonexamining reviewers' findings do no constitute substantial evidence. (*Id.*). Defendant counters that opinions of nonexamining doctors can constitute substantial evidence when their opinions are consistent with the independent clinical findings or other evidence of record.  (Doc. 27, pp. 19-20).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.' *See* SSR 96–8p, 1996 WL 374184, at *5; *accord* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)." *Robbins*, 466 F.3d at 883.  The Ninth Circuit has found error where substantial evidence did not support an ALJ's RFC determination. *See id.* at 883-85.  With regard to assessment of mental limitations, Defendant provides no citation

to clinical evidence consistent with nonexamining Dr. Garland's findings and/or the ALJ's assessment. (*See* Doc. 27, pp. 18-20). Moreover, based on the discussion above, the ALJ failed to state specific and legitimate reasons supported by substantial evidence of record to reject Dr. Renteria's April 24, 2013 opinions.   Consequently, the ALJ's resulting RFC determination was in error.

## V.   REMAND FOR FURTHER PROCEEDINGS

Plaintiff requests that the Court remand this matter for payment of benefits.  (Doc. 23, pp. 32-33).  Defendant requests, in the event the Court determines the ALJ committed harmful error, that the Court remand for further proceedings.  (Doc. 27, pp. 20-23).

"A district court may 'revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of Soc., Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation,' *id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))." *Dominguez,* 808 F.3d at 407.  Remand for an award of benefits is appropriate only where the following three prerequisites are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted). In evaluating whether further administrative proceedings would be useful, the court "consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Treichler*, 775 F.3d at 1103-04.

The Ninth Circuit has been clear that it is an abuse of discretion to remand "for an award of benefits when not all factual issues have been resolved."  *Treichler,* 775 F.3d at

1101, n.5 (citation omitted).  Moreover, even when all three factors of the test are met, the "district court retains the flexibility to 'remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"  *Id.* at 1102 (quoting *Garrison,* 759 F.3d at 1021); *see also Dominguez,* 808 F.3d at 407-08 ("the district court must consider whether…the government has pointed to evidence in the record 'that the ALJ overlooked' and explained 'how that evidence casts into serious doubt' the claimant's claim to be disabled.")(quoting *Burrell,* 775 F.3d at 1141).

As discussed above, the ALJ failed to state sufficient reasons, supported by substantial evidence of record to discount treating Dr. Renteria's April 24, 2013 opinions. While there are no outstanding issues that require further development of the record before Dr. Renteria's opinions can be credited, there are further issues that must be developed before Plaintiff can be awarded benefits.  The ALJ acknowledged that Dr. Renteria's opinion resulted in a finding that Plaintiff "was restricted to functioning that would preclude sedentary work.…" (Tr. 32).  There is no evidence in the record that the restrictions cited by Dr. Renteria would erode the sedentary work base so as to support a disability finding at step five.[9]  *See e.g.* SSR 96-9p, 1996 WL 374185 (addressing implications of RFC for less than a full range of sedentary work)).  "In cases where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence, [the Ninth Circuit has] consistently…remanded for further proceedings rather than payment of benefits." *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) (citation omitted); *see also Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012).  Because the VE's testimony did not address an RFC assessment that included Dr. Renteria's improperly rejected restrictions, this case must be remanded for further proceedings to determine an appropriate RFC assessment

---

[9] At the hearing before the ALJ, when Plaintiff's counsel was questioning the VE, the ALJ interrupted: "I know that, that you'd argue less than sedentary.  I already know that argument, Counsel, but I was just curious if there was a way to short circuit this without having to get into the rest of the testimony." (Tr. 70).

1   crediting Dr. Renteria's assessed restrictions and also including any other restrictions that

2   the ALJ may find based on the substantial evidence of record.

3       With regard to Plaintiff's statements about the limiting effects of her impairments,

4   "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a

5   claimant or other witness does not, without more, require the reviewing court to credit the

6   claimant's testimony as true." *Treichler,* 775 F.3d at 1106. "[O]nly where 'there are no

7   outstanding issues that must be resolved before a determination of disability can be

8   made,' do we have discretion to credit a claimant's testimony as true and remand for

9   benefits, and only then where 'it is clear from the record that the ALJ would be required

10  to find [the claimant] disabled' were such evidence credited." *Treichler,* 775 F.3d at

11  1106. (quoting *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir 2004)).   The Court declines

12  to credit Plaintiff's testimony as true.   Instead, in the event that Dr. Renteria's assessed

13  limitations do not establish disability, on remand the ALJ should also reassess Plaintiff's

14  credibility, which shall include, but not be limited to, a determination of the reasons for

15  declining surgery on her right knee and discontinuing physical therapy.

16  **VI.   CONCLUSION**

17      For the foregoing reasons, the Court remands this matter for further proceedings

18  consistent with this Order.   Alternatively, on remand, "the ... [Commissioner] may decide

19  to award benefits." *See McAllister v. Sullivan*, 888 F.2d 599, 604 (9th Cir. 1989).

20      Accordingly, IT IS ORDERED that:

21      (1)    the Commissioner's decision denying benefits is REVERSED; and

22      (2)    this matter is REMANDED to the Commissioner for further proceedings

23  consistent with this Order.

24      The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its

25  file in this matter.

26      Dated this 28th day of March, 2016.

27

28

_____
Bernardo P. Velasco
United States Magistrate Judge